78 F.3d 597
 NOTICE: Although citation of unpublished opinions remains unfavored, unpublished opinions may now be cited if the opinion has persuasive value on a material issue, and a copy is attached to the citing document or, if cited in oral argument, copies are furnished to the Court and all parties. See General Order of November 29, 1993, suspending 10th Cir. Rule 36.3 until December 31, 1995, or further order.
 ROYE REALTY AND DEVELOPING, INC., an Oklahoma corporation,
Plaintiff-Appellant,
v.
Arkla, Inc., a Delaware corporation, Defendant-Appellee.
ROYE REALTY AND DEVELOPING, INC., an Oklahoma corporation,
Plaintiff-Appellant,
v.
ARKLA, INC., a Delaware corporation, Defendant-Appellee.
 Nos. 94-6218, 94-6305.
D.C. No. CIV-89-993-R.
 United States Court of Appeals, Tenth Circuit.
 Feb. 28, 1996.
 
 ORDER AND JUDGMENT[1]
 Before EBEL, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and JENKINS,[2] Senior District Judge.
 EBEL, Circuit Judge.
 
 
 1
 Plaintiff-Appellant Roye Realty & Developing, Inc. ("Roye") brings this diversity action against Defendant-Appellee Arkla, Inc. ("Arkla") for repudiation of a long-term "take or pay" natural gas purchase contract. Specifically, Roye claims that Arkla repudiated the contract by failing to perform and/or wrongfully attempting to terminate the agreement.[3] In a bench trial, applying Oklahoma law, the district court rejected Roye's repudiation claim. The court also awarded Arkla attorney fees and costs as a prevailing party pursuant to Oklahoma statute. Roye appeals both the district court's ruling on its repudiation claim and the award of attorney fees and costs. We affirm the rulings of the district court on both issues.
 
 I. BACKGROUND
 
 2
 On October 11, 1982, Arkla and the Gulf Oil Corporation ("Gulf") executed a 15-year gas purchase contract covering the production of two wells in Oklahoma known as the Epley # 1-14 and the Bagley-Griffin # 1-14. Roye obtained Gulf's rights under the contract after Chevron U.S.A., Inc. ("Chevron") acquired Gulf, and then sold the wells to Roye on August 1, 1988. The contract, as amended, provided that Arkla would purchase or "take" a minimum quantity of gas from each well or, in the alternative, pay an annual amount based on the minimum take obligation.[4] The contract further provided that the price would be the maximum price allowed by federal regulation. However, the contract also contained a deregulation clause, by which either party had the right to renegotiate the price if the federal government lifted its price controls on natural gas.
 
 
 3
 The government deregulated the types of wells covered by the contract effective January 1, 1985. In anticipation of that deregulation, Arkla sent Gulf a letter proposing to amend the contract by establishing a new price and providing for future price renegotiations.[5] Based on that letter, Arkla and Gulf agreed to amend the base contract. The "1984 Letter Agreement" established a price of $2.75 per MMBtu effective from January 1, 1985 to December 31, 1985, and provided further that
 
 
 4
 [t]hereafter the price to be paid for such gas shall continue to be $2.75 per MMBtu, provided that at any time on or after October 1, 1985, either party shall have the right by written notice to the other to require a further renegotiation of the price to be paid for such gas. If the parties agree on such a further renegotiated price it shall be paid for all such gas delivered hereunder on and after the later of the date of such agreement or on January 1, 1986. If the parties have not agreed on such a further renegotiated price within 90 days after delivery of such renegotiation notice, the price to be paid shall continue to be $2.75 MMBtu, but either party shall have the right to cancel this contract as to such gas by written cancellation notice delivered to the other at any time before a renegotiated price has been agreed upon.
 
 
 5
 Appellant App. at 38. Following the letter agreement, Arkla attempted to renegotiate a price with Gulf and then Chevron several times in a series of correspondence as follows:
 
 
 6
 -- November 15, 1985--Pursuant to the 1984 Letter Agreement, Arkla gave Gulf notice by letter that it was requiring a renegotiation of the contract price. Arkla proposed a new price of $2.35 per MMBtu to be effective January 1, 1986, and suggested that prices be renegotiated every six months thereafter. Appellant App. at 757-60.
 
 
 7
 -- January 1, 1986--After having not received a response to its November 15, 1985 letter, Arkla sent a reminder letter stating that it would assume Gulf agreed to the new proposed terms if Gulf did not reject Arkla's offer. Arkla also stated that this letter would serve as a notice of Arkla's cancellation of the contract if Gulf rejected its proposal. Appellant App. at 763.
 
 
 8
 -- January 17, 1986--Chevron, as successor to Gulf, responded to Arkla by letter and purported to accept the $2.35 per MMBtu price and reject Arkla's other proposed changes to the contract. Appellant App. at 336, 765-66. Arkla maintains that it never received this letter. Appellant App. at 357.
 
 
 9
 -- May 27, 1986--Arkla sent Gulf another letter requiring a renegotiation of the contract price effective July 1, 1986 and outlining the following two proposals: (1) a new price of $1.90 per MMBtu with price renegotiation at any time upon certain notice; or (2) a new price of $1.70 per MMBtu with quarterly price renegotiations. Appellant App. at 767-73.
 
 
 10
 -- July 8, 1986--After receiving no response to its May 27, 1986 letter, Arkla sent a reminder letter to Gulf and stated that it would consider the contract cancelled if it did not receive an affirmative response by July 20, 1986. Appellant App. at 774.
 
 
 11
 -- July 31, 1986--Chevron responded to Arkla's May 27, 1986 and July 8, 1986 letters, and stated that it was willing to renegotiate the price, but that it considered Arkla's May 27 letter of no effect because it attempted to impose a unilateral modification of the contract. Chevron also indicated that Arkla and Chevron had agreed orally on July 18, 1986 to extend Arkla's July 20, 1986 deadline until August 1, 1986. Appellant App. at 775-76.
 
 
 12
 -- November 24, 1986--Arkla sent Gulf another letter requiring a further renegotiation of the contract price, and outlined the following three proposals to be effective January 1, 1987:(1) a new price of $2.20 per MMBtu with price renegotiation after one year upon certain notice and conditions; (2) a new price of $1.90 with price renegotiation twice yearly; or (3) a new price of $1.60 per MMBtu with quarterly price renegotiation. Appellant App. at 777-87.[6]
 
 
 13
 Roye maintains that Arkla and Chevron actually agreed on a $2.35 per MMBtu price. The district court found that no binding agreement was ever formed after the 1984 Letter Agreement. Arkla did, in fact, begin paying the $2.35 price; however, it later reverted to paying $2.75, informing Roye that it had been paying an incorrect price.[7] Roye accepted the $2.75 price without question.
 
 
 14
 In any event, Roye acquired the wells and Chevron's contract rights on August 1, 1988, and requested that Arkla schedule new deliverability tests for the wells.[8] Following several unsuccessful attempts to arrange for deliverability tests in preparation for Arkla's purchase of the output of the wells, Roye then requested that Arkla provide assurance that it intended to perform its obligations under the contract pursuant to Oklahoma's Uniform Commercial Code, Okla. Stat. tit. 12A 2-609. In response, Arkla assured Roye that it intended to meet its contractual obligations. However, Arkla maintains that it had no obligation to take or pay at this time because the wells were not prepared to deliver. Arkla offered Roye a release from the contract in exchange for a waiver of Arkla's take-or-pay obligations, but Roye rejected the offer.
 
 
 15
 Then, approximately two months later on January 19, 1989, Arkla notified Roye that it was requiring a renegotiation of the contract both as to price and as to other terms. Arkla proposed either: (1) a price of $1.75 per MMBtu and a limited release of Arkla's take-or-pay obligations; or (2) a price of $1.35 per MMBtu with quarterly price renegotiation. Roye responded by asking Arkla which specific contract provision entitled Arkla to renegotiate. Arkla pointed Roye to the base contract and the 1984 Letter Agreement. Roye did not respond further, and Arkla notified Roye that it was cancelling the contract on April 26, 1989. Roye maintains that Arkla never intended to purchase the annual minimums or make deficiency payments, as it was required to do by the contract.
 
 
 16
 Roye then filed suit, alleging that Arkla: (1) breached the contract; and (2) repudiated the contract by its purported cancellation and lack of performance.[9] The breach of contract was settled when Roye accepted Arkla's offer of judgment pursuant to Fed.R.Civ.P. 68 for $200,000, including costs, attorney fees, and interest.[10] The court held a bench trial on Roye's remaining repudiation claim and entered judgment for Arkla, holding that Arkla had rightfully cancelled the contract.[11]
 
 
 17
 Following the judgment, Arkla filed an application for attorney fees. The court ruled that Arkla was entitled to reasonable attorney fees as the prevailing party, but found that some of Arkla's claimed hours were duplicative. Pursuant to the court's order, Arkla then filed an amended application with a new billing statement. Roye did not object to the new application and advised the court that a hearing on the application was not necessary. The court then granted Arkla's request for $360,978.75 in attorney fees. The court also ordered that Arkla was entitled to costs of $2,213.94, as calculated by the court clerk. Roye now appeals the district court's decisions both as to its repudiation claim and as to the award of attorney fees and costs.
 
 II. CONTRACT REPUDIATION
 
 18
 Roye's contract repudiation claim essentially rests on two theories: (1) that Arkla repudiated its contract with Roye by materially breaching that contract before its purported cancellation; and/or (2) that Arkla repudiated the contract by wrongfully attempting to terminate the agreement. The district court rejected Roye's claims because it concluded that Arkla did not materially breach its agreement with Roye, and that Arkla properly terminated the agreement pursuant to its rights under the contract. We apply Oklahoma substantive law to this diversity contract action, Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938), and review the district court's conclusions of law de novo, Salve Regina College v. Russell, 499 U.S. 225, 231 (1991), and its findings of fact for clear error, id. at 233. In so doing, we affirm the court's judgment for Arkla.
 
 
 19
 Under Oklahoma law,[12] repudiation consists of "an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance."[13] Okla. Stat. tit. 12A 2-610 (comment 1); see also Bankers' Mortgage Co. v. Schwab, 280 P. 819, 820 (1929) (where one party to a contract declared intention not to perform, other party could treat declaration as total breach and bring action for damages on the entire contract); Waggoner Refining Co. v. Bell Oil & Gas Co., 244 P. 756, 758 (Okla.1926) (where seller did not intend to perform material term of contract of sale, buyer was excused from its obligation to perform). Thus, Roye must establish that Arkla's purported failure to perform on the contract by failing to take gas or make deficiency payments, or Arkla's subsequent allegedly wrongful termination of the contract, constituted repudiation of the contract. We address each possibility in turn.
 
 A. Material Breach Constituting Repudiation
 
 20
 A breach of contract can constitute a repudiation of a contract if, in and of itself or in conjunction with other statements or actions, it is sufficiently substantial to signal a party's intent not to perform its remaining contractual obligations or to render such future performance impossible. Roye argues that Arkla committed such a breach, as established by its confession of judgment on Roye's breach of contract claim, and its expressed intention of never performing its contractual obligations. We disagree and affirm the district court's ruling that any breach that Arkla committed did not impair the value of the entire contract.
 
 
 21
 The take-or-pay contract at issue in the instant case is an installment contract. See Okla. Stat. tit. 12A 2-612(1) ("An installment contract' is one which requires or authorizes the delivery of goods in separate lots to be separately accepted, even though the contract contains a clause each delivery is a separate contract' or its equivalent."); Arkla Energy Resources v. Roye Realty & Developing, Inc., 9 F.3d 855, 860-61 (10th Cir.1993) (holding in an unrelated action between these same parties that gas contract calling for delivery in separate lots was an installment contract under Oklahoma law). A party's failure to fulfil some obligation under an installment contract does not constitute a repudiation unless it impairs the value of the entire contract. As Oklahoma's Uniform Commercial Code ("UCC") provides, only where the default on one or multiple installments "substantially impairs the value of the whole contract" is there "a breach of the whole." Okla. Stat. tit. 12A 2-612(3); see also id. (comment 6) ("Subsection (3) is designed to further the continuance of the contract in the absence of an overt cancellation."). In the instant case, Roye has identified no such substantial breach by Arkla that impaired the value of the whole multiyear take-or-pay contract.
 
 
 22
 Roye argues that the collateral estoppel effect of Arkla's confession of judgment on Roye's breach of contract claim establishes that Arkla repudiated the contract.[14] However, even giving the Rule 68 settlement preclusive effect[15] would not establish that Arkla repudiated the contract. Through its settlement of Roye's breach of contract claim, Arkla admitted only that it breached its promise to take or pay for certain quantities of gas on the Epley well and was, therefore, liable for $200,000 in damages.[16] Thus, Arkla's breach only went to one of the two wells under contract, and related only to the single year that Roye was a party to the contract. As the district court found, "[a] breach, if any, was relatively insubstantial and never went to the essence of the contract nor discharged Roye Realty from its obligations." Such a single and limited breach of contract, without more, neither impairs the value of the entire contract nor signals Arkla's intent not to perform in the future. See Kirkwood Agri-Trade v. Frosty Land Foods Int'l, Inc., 650 F.2d 602, 604 (5th Cir. Unit B July 1981) (explaining that default on single installment "is not necessarily equivalent to a breach of the whole contract").
 
 
 23
 The Oklahoma Supreme Court's decision in Roye Realty & Developing, Inc. v. Arkla, Inc., 863 P.2d 1150 (Okla.1993), which Roye cites, is not to the contrary. In that case, the Oklahoma Supreme Court stated that
 
 
 24
 [b]ecause there is a second alternative available for Arkla to perform, failure to take and pay for gas merely constitutes a decision not to perform the first alternative obligation and is not a repudiation of the contract. Repudiation of the contract does not occur until Arkla also refuses to make the required deficiency payments.
 
 
 25
 Id. at 1157 (emphasis in original). The quoted language can be read to provide that the mere breach of a take-or-pay contract--that is, failing to take and pay and then also refusing to make a deficiency payment--constitutes a repudiation. However, such a reading takes the quoted language out of context. The court in that case explicitly did not address what constitutes a repudiation, or whether Arkla repudiated the contract, but merely answered the certified question of what the appropriate measure of damages would be in the event of an anticipatory repudiation. Id. at 1153. In the quoted passage, the court explained that the pay prong of the take-or-pay contract should not be viewed as a liquidated damages provision, but as an alternative means of performance. Given that context, we read the court as providing that if Arkla repudiated the contract by nonperformance, the repudiation could only have occurred after it failed to make deficiency payments and not by its failure to purchase gas alone, because the latter failure would not even constitute a breach. Moreover, as the district court emphasized, the quoted passage states that Arkla must have "refused" to make the required deficiency payments. Roye argues that "refuse" is synonymous with "fail" and could even encompass a single unintentional breach. However, such a reading would alter the well established concept of repudiation as involving a knowing and overt rejection of contractual obligations. Accordingly, we do not read the Oklahoma Supreme Court's decision as establishing that the mere breach of a single installment of a take-or-pay contract by itself necessarily constitutes a repudiation.
 
 
 26
 Roye maintains, nevertheless, that Arkla manifested its intent not to perform through other statements it made beyond the mere breach established by the Rule 68 judgment, and that Arkla's overall conduct still amounted to a repudiation of the contract. For example, Roye emphasizes that Arkla officials testified that Arkla did not intend to make any deficiency payments to Roye, as Roye alleges were required by the contract, and never even calculated whether or to what extent Arkla owed any deficiencies. However, Arkla explains that it did not make any such payments on the Epley well because it believed that it had satisfied its minimum obligations given the number of days the wells were prepared to deliver, not because it intended to reject its contractual obligations.[17] Arkla further explains that it continued to nominate gas for delivery from both wells after the end of the contract year on the Epley well, thereby demonstrating an intent to continue performance despite its $200,000 breach. Accordingly, notwithstanding Roye's allegations, the record before us contains no objective evidence indicating that Arkla did not intend to perform its future contractual obligations even if it did wrongfully refuse to make a deficiency payment in a particular year on the Epley well.[18]
 
 
 27
 As such, Roye has failed to show that Arkla's admitted breach, either by itself or coupled with other statements or actions, evinced the kind of overt communication of an intent not to perform its future contractual obligations that is required to establish repudiation.[19] As such, Roye must rely on its claim that Arkla wrongfully terminated the agreement to establish repudiation. We now turn to that claim.
 
 B. Wrongful Termination Constituting Breach
 
 28
 Even if Arkla's prior failure to perform its contractual obligations did not constitute a repudiation of the contract, Roye argues that Arkla repudiated the contract when it attempted wrongfully to terminate the agreement. In particular, Roye claims that (1) Arkla did not have a right to terminate under the contract; and (2) even if the contract provided for termination, Arkla lost whatever contractual rights it might have had because it (a) was in breach; (b) waived those rights; or (c) acted in bad faith. If Arkla's attempted termination was wrongful, it would constitute an anticipatory repudiation of the contract. See Osborn v. Commanche Cattle Indus., Inc., 545 P.2d 827, 830 (Okla.Ct.App.1975) (holding that wrongful termination in contravention of contractual terms gave rise to a cause of action for total breach); see also REA Express, Inc. v. Interway Corp., 538 F.2d 953, 955 (2d Cir.1976) ("[I]nsistence upon terms which are not contained in a contract constitutes an anticipatory repudiation thereof."); Restatement of Contracts (Second) 250 (comment d) ("Generally, a party acts at his peril if, insisting on what he mistakenly believes to be his rights, he refuses to perform his duty.").[20] However, the district court found that Arkla possessed the contractual right to terminate its agreement with Roye and properly exercised that right. We agree, and, therefore, affirm the court's ruling that Arkla did not repudiate the contract.
 
 
 29
 i. Right to Terminate Under the Contract
 
 
 30
 Roye concedes that the take-or-pay contract, as amended by the 1984 Letter Agreement, gave Arkla some right to require a renegotiation of the contract price and terminate the agreement if the parties could not agree on a new price. However, Roye maintains that the contract only provided Arkla a one-time right to renegotiate, and that Arkla had already exercised that right. We conclude that the contract's express terms are ambiguous. Nevertheless, looking to the parties' correspondence leading up to the 1984 Letter Agreement, we hold that Arkla could require more than one renegotiation of the contract price and could terminate the agreement upon the failure of those renegotiations. Furthermore, even if the contract only provided for a one-time right to renegotiate and cancel, we conclude that Arkla did not exercise that right prior to its April 26, 1989 termination.
 
 
 31
 Oklahoma law provides that a contract must be interpreted to give effect to the mutual intent of the parties at the time they formed the contract. Okla. Stat. tit. 15 152. Where a contract is in writing, the writing alone should be used to determine the parties' intent if possible. Id. 155; see also id. 154 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."). However, the course of performance by parties to a contract remains relevant to construing a contract's express terms. Okla. Stat. tit. 12A 2-208. In addition, where the written agreement is ambiguous, a court can look to the negotiations preceding an agreement or other parol evidence to discern the intent of the parties. Public Serv. Co. v. Home Builders Ass'n of Realtors, Inc., 554 P.2d 1181, 1185 (Okla.1976). Where a written agreement is not ambiguous, parol evidence is excluded. Okla. Stat. tit. 15 137; Terrill v. Laney, 193 P.2d 296, 300 (1948). Applying these principles to the instant case, we look first to the written contract but conclude that its express terms are ambiguous and do not clearly specify the scope of the parties' renegotiation and cancellation rights.
 
 
 32
 On the one hand, the 1984 Letter Agreement provided that the parties could require a further renegotiation of price "at any time on or after October 1, 1985," and, as the district court noted, "at any time" indicates the right to unlimited renegotiations. Such an interpretation would be consistent with the factual context surrounding the 1984 Letter Agreement. That is, prior to January 1, 1985, the contract price was established by reference to government regulations. Pursuant to the 1984 Letter Agreement, the parties established an initial deregulated price to remain in place for one year and provided for further renegotiation thereafter, presumably to create ongoing sensitivity to market prices. Roye has offered no explanation for why the parties would have provided for only one further renegotiation given that the price was already adjusted to market levels following deregulation. Moreover, it seems unlikely that the parties would have fixed a set price that could only be adjusted once during the roughly 12 years still remaining on the contract.
 
 
 33
 Nevertheless, other aspects of the contract undercut this reading and suggest that the parties intended only a one-time right to renegotiate. In particular, the contract provided that, if the parties could not agree on a renegotiated price, the price "shall continue to be $2.75 per MMBtu." As the district court noted, this provision indicates an intent to allow only one price renegotiation from the $2.75 per MMBtu price, for if multiple price changes were contemplated the provision would likely have specified that the price would remain at whatever had been set as the most recently agreed upon price. In addition, it seems odd that the parties would have created a right to multiple renegotiations without limiting when renegotiations could be required or providing for a specific timetable for new negotiations. Moreover, the phrase "at any time," which might suggest unlimited renegotiations, could also be read merely to provide for when renegotiations were permitted and not for how often they could occur or how many were allowed. The contract itself specified that "at any time ... either party shall have the right ... to require a further renegotiation" (emphasis added), which could indicate a single renegotiation. Accordingly, we remain unable to discern the intent of the parties based on the express terms of the contract,[21] see Wards Co., Inc. v. Stamford Ridgeway Assocs., 761 F.2d 117, 120 (2d Cir.1985) (contract ambiguous where "susceptible of at least two fairly reasonable meanings") (quotation omitted), and look to parol evidence and, in particular, to the negotiations between Arkla and Gulf leading up to the 1984 Letter Agreement.
 
 
 34
 Those negotiations and correspondence indicate that the parties to the contract contemplated the right to require annual price negotiations. Specifically, when Arkla wrote Gulf to propose amending the contract in 1984 in anticipation of deregulation, Gulf responded by requesting that: (1) the price be $3.25 per MMBtu instead of $2.75 per MMBtu as Arkla had proposed; and (2) there be annual price renegotiations beginning January 1, 1986. In response, Arkla agreed to including annual price renegotiations, rejected the $3.25 per MMBtu price, and instructed Gulf to make the appropriate changes to the contract and return an executed copy if it agreed to Arkla's offer. Accordingly, when Gulf accepted that offer, the parties had agreed to annual price renegotiations. That agreement is reflected in the executed contract where the parties revised Arkla's proposal to specify that the deregulated price of $2.75 per MMBtu only be effective from January 1, 1985 through December 31, 1985 (the proposal had specified that the price would be effective through December 31, 1986) and initialled the change. Although the parties could have provided more clearly that there would be annual price renegotiations, we conclude based on their preceding correspondence and agreement, that they intended to so provide. Thus, when Arkla required a further renegotiation of price to Roye and subsequently cancelled the agreement when Roye did not respond, it was acting within its contractual rights.
 
 
 35
 Even if we were to interpret the contract to provide only for a single renegotiation and cancellation right, we would hold that Arkla had yet to exercise that right before 1989. The 1984 Letter Agreement provided that a party could cancel the contract at any time 90 days after it delivered a price renegotiation letter and before the parties agreed upon a renegotiated price. Based on the record before us, we conclude that the parties never agreed upon a new price notwithstanding Arkla's multiple attempts to establish one, and therefore, Arkla possessed the right to cancel the contract.
 
 
 36
 Chevron purported to accept Arkla's proposal of a $2.35 per MMBtu price in its January 17, 1986 letter, but, as the district court found, that acceptance was not effective. Roye maintains that Chevron's acceptance of the November 15, 1985 offer was effective on dispatch under Oklahoma's version of the mailbox rule, codified at Okla. Stat. tit. 15 69. However, Arkla never received that purported acceptance. Generally, an acceptance is effective even if it is lost in transit and never received by the offeror. Restatement of Contracts (Second) 63 (comment b); I E. Allan Farnsworth, Farnsworth on Contracts, 3.22 at 280 (1990). However, an offeror can provide otherwise, see Restatement of Contracts (Second) 60 & 63, and in the present case Arkla specified that acceptance would only be accomplished by Arkla's receipt of an executed return copy of Arkla's offer. Thus, there never was an effective acceptance or resulting agreement on a new price.[22] Arkla's subsequent attempts to renegotiate did not produce even a purported acceptance. Accordingly, the parties never reached an effective agreement on a new price, and Arkla never lost its right to cancel the agreement, which arose when it proposed a price renegotiation and 90 days passed without the parties agreeing on a new price. Absent waiver, which we discuss below, Arkla's subsequent attempts to renegotiate did not alter that termination right. Similarly, Arkla never exercised that right to cancel the agreement. Although Arkla threatened to cancel the contract at various points in time, it never actually carried through on its threats, and both sides continued to act at all times as if there were a valid contract.[23] Thus, whether the contract provided for annual or one-time renegotiation, Arkla acted within its rights under the contract. In the following sections, we address whether Arkla somehow forfeited that contractual right.
 
 
 37
 ii. Impact of Breach on Right to Terminate
 
 
 38
 Roye first maintains that Arkla lost whatever contractual rights to terminate it might have had by its failure to perform on other parts of the contract. Specifically, Roye argues that Arkla cannot take advantage of the termination provisions of the contract because it was in breach on its take-or-pay obligations on at least the Epley well. However, Roye advances no authority for its proposition. The authorities cited by Roye establish that if a party is in total breach of a contract or repudiates a contract, it loses its right to terminate that contract, see, e.g., Prudential Ins. Co. of America v. Faulkner, 68 F.2d 676, 679 (10th Cir.1934) ("One who repudiates his obligation under a contract cannot thereafter exercise an election contained in its provisions."), but, as explained above, Roye has not established that Arkla repudiated the contract or that any breach by Arkla went to the essence of the agreement. Termination rights survive such partial breaches. As Corbin, whom Roye itself relies upon, states,
 
 
 39
 [a] party who has reserved a power of termination loses that power if he himself commits such a breach as goes to the essence and discharges the other party.... However, one who commits a partial breach that does not discharge the other party from his contractual obligation does not thereby extinguish his power of termination that is expressly reserved.
 
 
 40
 6 Arthur L. Corbin, Corbin on Contracts 1266 at 68-69 (1962). Accordingly, Arkla did not lose its termination power because of its breach of other contractual obligations.
 
 
 41
 iii. Waiver
 
 
 42
 Roye argues next that Arkla waived any cancellation rights it might have had under the contract by issuing cancellation notices during its correspondence with Gulf and Chevron and then rescinding or failing to act upon those notices. Roye claims that Arkla must provide reasonable notification of its retraction of its previous waiver under Okla. Stat. tit. 12A 2-209(5) before it can reassert its cancellation rights. However, Roye has failed to establish that Arkla displayed a clear intention to relinquish its cancellation rights. See Hidalgo Properties, Inc. v. Wachovia Mortgage Co., 617 F.2d 196, 199 (10th Cir.1980) (stating that Oklahoma law requires a clear expression of the intent to relinquish rights for waiver to be found).
 
 
 43
 Arkla first threatened to cancel the contract in its January 1, 1986 letter, in which it stated that the letter would serve as a cancellation notice if Gulf rejected its proposal. However, neither Gulf nor its successor Chevron ever rejected Arkla's proposal. Rather, Chevron actually purported to accept Arkla's proposal, and at least indicated a willingness to engage in price renegotiations. As such, Arkla's failure to cancel the contract does not indicate what it would or would not do in the event that its proposal were rejected and no new price agreed upon. Arkla's second threatened cancellation came in its July 8, 1986 letter to Chevron, in which it stated that it would cancel the contract if Chevron did not agree to its proposal for a new price by July 20, 1986. Arkla and Chevron then extended the deadline by oral agreement to August 1, 1986, and by its July 31, 1986 letter Chevron indicated its intention to enter into further negotiations. Again, Arkla's failure to effect a cancellation in the midst of ongoing negotiations does not indicate a clear intent to relinquish its right to terminate the contract if renegotiations were ultimately unsuccessful. Moreover, even if Arkla had previously waived its termination rights, Arkla provided Roye some notice that it was reasserting those rights when it corresponded with Roye in 1989 and answered Roye's query about which contractual provision gave Arkla the right to require a renegotiation. Accordingly, we hold that Arkla did not waive its right to terminate the contract upon the parties' failure to agree upon a new price.
 
 
 44
 iv.Bad Faith
 
 
 45
 Finally, Roye asserts that Arkla's attempted termination was ineffective because it was exercised in bad faith. Okla. Stat. tit. 12A 1-203 requires that "[e]very contract or duty within this Act imposes an obligation of good faith in its performance or enforcement." Good faith between merchants is defined as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." Id. 2-103. Roye somewhat obliquely suggests that Arkla breached its obligation to act in good faith by: (1) seeking a new price without a legitimate commercial reason; (2) falsely assuring Roye that it intended to perform the contract; and (3) attempting to renegotiate contractual terms other than price. We remain unpersuaded that Arkla acted in bad faith.
 
 
 46
 First, Roye provides no authority to support its claim that Arkla must articulate a legitimate commercial reason for seeking a renegotiated price. Roye cites Okla. Stat. tit. 12A 2-209, which provides that parties cannot use extortion to modify contracts without the support of new consideration. However, Arkla did not seek a modification of the contract, but rather exercised an existing right provided under the contract. Moreover, Roye has not established that Arkla lacked a legitimate commercial reason to seek a lower reasonable purchase price.
 
 
 47
 Second, Roye has not shown that Arkla falsely assured Roye that it intended to continue performing on the contract. Arkla explains that it intended to continue the contract when it responded to Roye, and only terminated the agreement when the parties were unable to agree on a new price, as was its right under the contract. Even if Roye could show that Arkla falsely assured Roye, Roye has not shown how it relied on that assurance or how any assurance would make Arkla's subsequent termination wrongful if that termination were still pursuant to the contract's terms.
 
 
 48
 Third, Arkla's attempt to negotiate terms other than price does not render its termination based on the failure to agree on a new price improper. Nothing in the contract barred Arkla from proposing modifications to any aspect of the contract, even if the contract only specifically provided for the right to renegotiate price. As such, Arkla would not have been entitled to terminate the contract based on the failure of the parties to agree on one of these other terms, but its attempt to change these other terms did not impact its contractual right to cancel when the parties could not agree on a new price. Accordingly, Arkla both possessed the contractual right to terminate and did nothing to waive or otherwise forfeit that right.[24]
 
 III. ATTORNEY FEES
 
 49
 Roye maintains that the district court erred in awarding Arkla attorney fees and costs as the prevailing party under Okla. Stat. tit. 12 936. Roye challenges the district court's award on two grounds: (1) that Arkla was not a prevailing party; and (2) that the court lacked an evidentiary basis upon which to determine that Arkla's fee request was reasonable. We review the meaning of "prevailing party" de novo, and the district court's determination of who satisfied that meaning for abuse of discretion. Arkla, 9 F.3d at 865-866 (citing Oklahoma law). In so doing, we affirm the court's award of fees and costs to Arkla, although based upon a different rationale than that employed by the district court.
 
 
 50
 Okla. Stat. tit. 12 936 provides in relevant part that "[i]n any civil action to recover on ... [a] ... contract relating to the purchase or sale of goods ... the prevailing party shall be allowed a reasonable attorney fee to be set by the court, to be taxed and collected as costs." "A prevailing party under section 936 must have prevailed upon the merits." Arkla, 9 F.3d at 866. If a plaintiff prevails on only one of several claims against a defendant, that plaintiff still counts as the prevailing party. The Company, Inc. v. Trion Energy, 761 P.2d 470, 471-72 (Okla.1988) ("The prevailing party is the party who has an affirmative judgment rendered in his favor at the conclusion of the entire case."); see also Arkla, 9 F.3d at 866 ("[S]ection 936 allows only one prevailing party, which is the party that has the most points at the end of the contest,' or that receives the greatest affirmative judgment.") (quoting Quapaw Co. v. Varnell, 566 P.2d 164, 167 (Okla.Ct.App.1977)); Quapaw, 566 P.2d at 167 (quoting Ozias v. Haley, 125 S.W. 556 (Mo.App.1910), approvingly which stated that "the party in whose favor the verdict compels a judgment is the prevailing party"). Thus, where defendants do not obtain their own affirmative judgment, they must successfully defend against all of a plaintiff's claims to be deemed prevailing parties. See, e.g., Ellis v. Lebowitz, 799 P.2d 620, 621 (Okla.1990).[25]
 
 
 51
 In the instant case, Roye prevailed on its breach of contract claim through Arkla's confession of judgment pursuant to Fed.R.Civ.P. 68, while Arkla successfully defended against Roye's repudiation claim.[26] Applying the general rules outlined above, Roye would be the prevailing party as the only party who obtained an affirmative judgment. However, we face a special case because Roye's affirmative judgment was bifurcated from the claim upon which it lost. That is, the court entered the confession of judgment on the breach of contract claim in a separate order, and under Oklahoma law that judgment extinguished the underlying breach of contract claim. See Fleet v. Sanguine, Ltd., 854 P.2d 892, 898-99 (Okla.1993) (explaining that acceptance of an offer of judgment extinguishes the cause of action). As such, when Roye proceeded to trial on its repudiation claim, it was as if it had initiated a separate lawsuit containing only that claim. Arkla successfully defended against that claim, and, therefore, was the prevailing party. Arkla could be awarded attorney fees not because its avoidance of Roye's multi-million dollar repudiation claim outweighed the $200,000 settlement to which Arkla confessed, but because it prevailed on the sole cause of action in the judgment currently before us.
 
 
 52
 Moreover, the court did not abuse its discretion in awarding Arkla $360,978.75 in fees. Roye maintains that the district erred by awarding fees without conducting an evidentiary hearing to assess Arkla's claimed expenditures. Specifically, Roye argues that the court lacked a factual basis to review the number of hours Arkla claims it spent on particular tasks. Cf. Ramos v. Lamm, 713 F.2d 546, 553 (10th Cir.1983) (directing courts reviewing fee applications in federal civil rights cases to review the number of hours spent on specific tasks). However, notwithstanding Roye's protestations, the district court had a detailed factual basis upon which to judge whether Arkla's requested fees were reasonable.[27]
 
 
 53
 Roye highlights that Arkla's initial fee application lacked a detailed breakdown of the hours spent on different tasks. However, Arkla included such a breakdown in its amended application, and that amended application formed the basis of the court's order. The court did use Arkla's initial application to rule that Arkla was entitled to a reasonable fee award, but struck the billing statement attached to that application and explicitly deferred its final determination of reasonableness until it received a subsequent application from Arkla. Roye does not challenge the second billing statement submitted by Arkla. Nevertheless, Roye argues that the court deferred its reasonableness determination only as to the issue of duplicative charges, and, therefore, effectively ruled on most of Arkla's fee request based on a flawed billing statement. However, the court did not grant any specific fees until it received a proper application. Accordingly, the court had a sound basis for its ultimate order, and we decline to second-guess its judgment.
 
 
 54
 In addition, Roye did not object to Arkla's amended application and stated to the district court that no hearing was necessary on Arkla's request. As such, Roye waived its right to attack the court's order, at least in part. In response, Roye argues that the only issue left open after the district court's first order was duplicative charges, and that its waiver of a hearing on that issue did not constitute a waiver as to the overall reasonableness of Arkla's request. However, although the court's first order foreclosed objection to the issues of who was the prevailing party and whether it was unfair to charge Roye for fees related to delays caused by Arkla or the court, Roye still could have objected to Arkla's new billing statement and the reasonableness of the charges listed therein. As to charging Roye for fees related to delay caused by Arkla, Roye has not provided a basis to question the district court's finding that Arkla did not unjustly prolong the litigation. Similarly, Roye has not cited any authority that delays caused by decisions of the court--like certifying a question to a state supreme court--should be subtracted from fee awards.
 
 IV. CONCLUSION
 
 55
 For the foregoing reasons, we AFFIRM the district court's judgment for Arkla on Roye's repudiation claim and also AFFIRM the court's award of fees and costs to Arkla.
 
 
 
 [1]
 This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3
 
 
 [2]
 The Honorable Bruce S. Jenkins, Senior District Judge, United States District Court for the District of Utah, sitting by designation
 
 
 [3]
 The parties previously settled a separate claim that Roye brought against Arkla for simple breach of contract
 
 
 [4]
 The minimum take obligation was calculated based on the average daily volume of the given well and the number of days that gas was available to Arkla during a contract year. The contract specified that the average daily volume would be 50 percent of the daily deliverability of each well as determined by deliverability tests
 
 
 [5]
 Arkla and Gulf also previously amended the contract in various technical aspects on April 15, 1983
 
 
 [6]
 The record before us contains an additional letter from Arkla to Gulf dated March 20, 1987, in which Arkla stated that Gulf had not responded to its November 24, 1986 letter and that it would consider the contract cancelled if it did not hear from Gulf by April 1, 1987. Appellant App. at 788. The record before us contains no subsequent correspondence from March 20, 1987 until Roye acquired the wells. However, neither party argues that the March 20, 1987 letter or April 1, 1987 deadline triggered a cancellation of the contract
 
 
 [7]
 Arkla explains that it was paying the $2.35 price pursuant to its January 1, 1986 letter in which it stated that it would assume Gulf agreed to the new price if Gulf did not object, and not pursuant to any actual new agreement on a renegotiated price
 
 
 [8]
 The wells had been dormant since May of 1987 because they could not produce without compression and Gulf did not have compression installed
 
 
 [9]
 Roye originally alleged that it incurred $900,000 plus interest in actual damages from Arkla's breach and $8 million plus interest in lost economic benefits from Arkla's repudiation
 
 
 [10]
 Rule 68 provides, in relevant part, that "a party defending against a claim may serve upon the adverse party an offer to allow judgment to be taken against the defending party.... If ... after the service of the offer the adverse party serves written notice that the offer is accepted, either party may then file the offer and notice of acceptance together with proof of service thereof and thereupon the clerk shall enter judgment."
 
 
 [11]
 Before reaching a judgment, the court certified the question of what measure of damages applies to the anticipatory repudiation of a take-or-pay contract to the Oklahoma Supreme Court. The Oklahoma Supreme Court answered the question in Roye Realty & Developing, Inc. v. Arkla, Inc., 863 P.2d 1150 (Okla.1993)
 
 
 [12]
 Take-or-pay natural gas contracts are governed by the Oklahoma Uniform Commercial Code, Okla. Stat. tit. 12A 1-101 et seq. Roye Realty, 863 P.2d at 1153-54
 
 
 [13]
 Similarly, "a repudiation automatically results ... when a party fails to provide adequate assurance of due future performance within thirty days after a justifiable demand therefor has been made." Okla. Stat. tit. 12A 2-610 (comment 2)
 
 
 [14]
 Arkla argues that the Rule 68 order cannot be considered altogether in this appeal because Roye never offered the order into evidence, and a party cannot predicate a claim of error on evidence that was not offered to the lower court. Roye maintains that it attempted to make an offer of proof to the district court, but the court rejected its offer. In any event, we take judicial notice of the judgment even if it was not offered into evidence. See St. Louis Baptist Temple, Inc. v. FDIC, 605 F.2d 1169, 1172 (10th Cir.1979) (providing that a federal court may take judicial notice of any court proceedings directly related to matters at issue)
 
 
 [15]
 The district court refused to give Arkla's Rule 68 confession of judgment preclusive effect because it ruled that the settlement agreement did not represent an "actual litigation" of any issues as to Arkla's liability. Generally, collateral estoppel only applies to issues actually litigated on the merits. See Brown v. Felsen, 442 U.S. 127, 139 n. 10 (1979) ("[C]ollateral estoppel treats as final only those questions actually and necessarily decided in a prior suit."). However, the Oklahoma Supreme Court has held that
 [a] judgment by confession has the same legal effect as a judgment entered after trial by jury or to the court. It comes under the general definition [that a] judgment is the final determination of the rights of the parties in an action. Thus, a judgment by confession taken against a defendant ... is a final determination that a plaintiff has prevailed on his claim.
 Wieland v. Danner Auto Supply, Inc., 695 P.2d 1332, 1334 (Okla.1984) (internal citations and quotation marks omitted); see also Howell Petroleum Corp. v. Samson Resources Co., 903 F.2d 778, 783-84 (10th Cir.1990) (noting that Oklahoma law distinguishes between confessions of judgment and out-of-court settlements). Although Wieland involved the issue of who is a prevailing party for purposes of obtaining attorney fees, its holding and language potentially apply more broadly. That is, if a confession of judgment is to be given the same "legal effect" as other litigated judgments and count as a "final determination" of a plaintiff's claims, then Oklahoma might treat all of the issues necessary to the confession as settled between the parties. Thus, the district court's ruling appears to be in tension with Oklahoma law providing that a court-ordered settlement has the same legal effect as decisions fully litigated on the merits. Nevertheless, we need not resolve the proper scope of Wieland in the instant case, because, as explained in the text, even giving Arkla's confession of judgment preclusive effect does not establish that Arkla repudiated its contract with Roye.
 
 
 [16]
 The contract year on the Bagley-Griffin well did not end before Arkla attempted to terminate the agreement; thus, no deficiency payments were yet due on that well. As such, there is no breach regarding the Bagley-Griffin well that is relevant to Roye's repudiation claim independent of Arkla's allegedly wrongful termination of the entire agreement
 
 
 [17]
 Roye does not appear to have taken any action that would have put Arkla on notice that this perception was incorrect and that Arkla owed some deficiency. For example, Roye did not make its own deficiency calculations or make a claim to Arkla that take-or-pay payments were due
 
 
 [18]
 Similarly, Roye's repeated invocation of Arkla's breach of unrelated gas contracts provides little evidence of Arkla's intention with regard to the contract at issue in the present case
 
 
 [19]
 Whether Arkla harbored a secret or unexpressed intention not to perform its future contractual obligations is not relevant to Roye's repudiation claim. As Oklahoma's Uniform Commercial Code provides, repudiation centers on "an overt communication of intention." Okla. Stat. tit. 12A 2-610 (comment 1). Such a rule is consistent with the general emphasis in contract law on the objective expression of a party's intent. As Judge Learned Hand once explained,
 A contract has, strictly speaking, nothing to do with the personal, or individual, intent of the parties. A contract is an obligation attached by the mere force of law to certain acts of the parties, usually words, which ordinarily accompany and represent a known intent. If, however, it were proved by twenty bishops that either party when he used the words [or performed the acts] intended something else than the usual meaning which the law imposes on them, he would still be held....
 Hotchkiss v. National City Bank, 200 F. 287, 293 (S.D.N.Y.1911), aff'd, 201 F. 664 (2d Cir.1912), aff'd, 231 U.S. 50 (1913). Roye identifies no such objective expression or overt communication of Arkla's intent to repudiate the contract.
 
 
 [20]
 As we have noted in a previous case, the taking of an affirmative action based upon an incorrect interpretation of a contractual termination clause differs from the mere urging of a particular interpretation of a termination clause on an opposing party. Bill's Coal Co. v. Board of Public Utils., 682 F.2d 883, 886 & n. 2 (10th Cir.1982), cert. denied, 459 U.S. 1171 (1983). The latter, even if wrong, would not constitute a repudiation. Id
 
 
 [21]
 The district court found evidence of the parties' intent in their course of dealing following the 1984 Letter Agreement. In particular, the court highlighted that neither Gulf, Chevron, nor Roye ever objected to Arkla's multiple proposed renegotiations on the grounds that only one renegotiation was permitted under the contract. However, we do not base our interpretation of the contract on the parties' course of dealing. First, we are skeptical that the failure to object to Arkla's proposed renegotiations indicated that the contract provided for multiple renegotiations or that the parties acquiesced in a new contract term. As the district court noted and we discuss further below, the parties never reached an agreement on a new price following the establishment of a deregulated price of $2.75 per MMBtu despite Arkla's multiple attempts at renegotiating. Thus, any willingness to engage in further price renegotiation could have signalled that the parties believed one single extended renegotiation had been taking place, and does not clearly indicate that all parties believed the contract provided for multiple price renegotiations. Second, neither Chevron's nor Roye's course of dealing reveals anything of Gulf's intent when it entered into the 1984 Letter Agreement, and only Gulf's intent is relevant to that contract
 
 
 [22]
 Arkla also argues that Chevron's acceptance was not effective because it proposed different terms than Arkla's offer and was, therefore, conditional. However, for contracts covered by its Uniform Commercial Code, Oklahoma has adopted the general rule that a definite and seasonable expression of acceptance is effective even if it states additional terms different from those in the proposal, unless acceptance is made conditional on assent to those new terms. Okla. Stat. tit. 12A 2-207(1). The mere fact that an acceptance contains additional terms does not make it conditional. The proposed new terms then become part of the contract unless: (1) they would materially alter the offer; (2) the offer was explicitly limited to its own terms; or (3) the original offeror timely objects to the new terms. Id. 2-207(2)
 
 
 [23]
 Of course, the threats were valid pursuant to the contract and, therefore, cannot constitute the type of overt expression of an intent not to perform which would repudiate the contract
 
 
 [24]
 Roye also argues that the district court erroneously rejected its repudiation action because it found that Roye failed to notify Arkla of its breach of contract and demand performance before bringing an action for repudiation. Oklahoma law prohibits the creation of any notice, objection, or demand requirements as a prerequisite to bringing a contract claim. McDonald v. Amtel, Inc., 633 P.2d 743, 745-46 (Okla.1981). The Oklahoma Constitution itself states that "[a]ny provision of any contract or agreement, express or implied, stipulating for notice or demand other than such as may be provided by law, as a condition precedent to establish any claim, demand, or liability, shall be null and void." Okla. Const. Art. 23 9. Roye charges that the district court effectively violated this constitutional prohibition by holding that Roye's failure to notify Arkla that it was in breach of contract and demand performance was fatal to its repudiation claim. However, nothing in the district court's opinion indicates that the court imposed any such requirements of notice or demand on Roye
 Although the court referenced Roye's failure to notify Arkla that it was in breach of contract at several points in its opinion, those references generally involved factual findings related to the court's analysis and not legal holdings that Roye had to satisfy a notice or demand requirement before bringing a repudiation suit. For example, the court noted Roye's failure to object to Arkla's attempted renegotiation on the grounds that a further renegotiation was not permitted under contract; however, the court was merely highlighting a fact of the parties' course of dealing to assist in its interpretation of the 1984 Letter Agreement. Similarly, the court noted Roye's failure to demand that Arkla make a deficiency payment on the Epley well, but the court's factual finding merely related to the court's analysis of whether Arkla's breach could reasonably be construed as an overt indication that it did not intend to perform on the remainder of the contract. Perhaps most troubling is the court's discussion of Roye's failure to demand that Arkla make deficiency payments after Arkla cancelled the contract as part of the court's finding that Roye acted in bad faith by bringing a repudiation suit before trying other means to secure Arkla's performance. Nevertheless, even striking the court's entire discussion of Roye's "bad faith" in bringing suit before notifying Arkla would not alter our rejection of Roye's repudiation claim.
 
 
 [25]
 As such, the district court should not have balanced the "victories" of Arkla in defending the multi-million dollar repudiation claim and Roye in obtaining its $200,000 settlement. Although Quapaw states that the party with the most points at the end of a contest is the prevailing party, 566 P.2d at 167, "points" must be affirmative judgments. Thus, the court improperly equated Roye's affirmative monetary recovery with Arkla's mere defense against a claim. The cases cited by the district court in which defendants were awarded attorney fees even though they only successfully defended against some of the claims brought against them involved special fee statutes that are not implicated here. See, e.g., Trion, 761 P.2d at 472 (awarding defendant fees for prevailing on lien foreclosure action based on special lien fee-shifting statute, even though plaintiff prevailed on damages action); Sooner Pipe & Supply Corp. v. Rehm, 447 P.2d 758, 762 (Okla.1968) (same)
 
 
 [26]
 Arkla argues that a judgment obtained through settlement is not a judgment on the merits and that Roye should not be treated as a prevailing party at all; however, Bullard's Oil Field Serv., Inc. v. Williford Energy Co. provides that "[e]ven when a plaintiff receives a judgment by confession that plaintiff becomes a prevailing party for the purpose of 12 O.S.1991, 936." 839 P.2d 185, 189 n. 9 (Okla.1992); see also Wieland, 695 P.2d at 1334 (stating that a judgment by confession has the same legal effect as a judgment rendered after a full trial)
 
 
 [27]
 As Arkla notes, Roye has not challenged the reasonableness of the costs awarded to Arkla in its briefs on appeal, although Roye's notice of appeal filed with the district court indicated a challenge to the costs as well as the fees. Accordingly, we do not address that issue